AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original    ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
7/5/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CDO___ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
July 5, 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ch___ DEPUTY

United States of America,

v.

EDWARD WYSEL,
aka "Eddie"

Defendant

Case No.  2:24-mj-04032-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of August 8, 2022, in the County of Santa Barbara, in the Central District of California, the defendant violated Code Section 18 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Fentanyl Resulting in Death).

This criminal complaint is based on these facts:
*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Robert Thomas
Complainant's signature

Robert R. Thomas  DEA SSA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: July 5, 2024

[Judge's signature]
Judge's signature

City and state:  Los Angeles, California

Hon. Brianna F. Mircheff, U.S. Magistrate Judge
Printed name and title

AUSA: Lisa J. Lindhorst (x6772)

**AFFIDAVIT**

I, Robert Thomas, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against EDWARD WILLIAM WYSEL for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Fentanyl Resulting in Death).

2. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF ROBERT THOMAS

3. I am a Special Agent with the United States Drug Enforcement Administration ("DEA"). I have been so sworn since November 2009. I am currently assigned to the DEA's Los Angeles Field Division, Southern California Drug Task Force which is comprised of agents and officers from federal, state, and local agencies who are assigned to investigate large-scale drug trafficking. Additionally, I am assigned to the OD Justice Task Force, which is tasked with investigating overdose deaths,

1

including investigating the source of drugs that cause overdose deaths. I have been so assigned since the inception of the team in August 2018. During the course of my employment with the DEA, I have received several hundred hours of comprehensive, formal instruction on topics such as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of drug traffickers' telecommunications devices, surveillance, and other investigative techniques. I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of drugs and other controlled substances, and conspiracies involving drugs and controlled substance offenses. I have been involved in drug-related arrests that resulted in the seizure of drugs and other evidence. I have used a variety of investigative techniques and resources, including, but not limited to, surveillance, confidential sources, undercover operations, telephone toll analysis, installation, monitoring and retrieval of electronic tracking devices on cars, and wire intercept communications analysis in Title III wiretap investigations.

    4. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics, and the collection of money that represents the proceeds of narcotics trafficking and money laundering. I have also participated in investigations involving the installation, use, and maintenance of electronic

tracking devices in motor vehicles, which have led me to the confines of hotels, motels, businesses, and private residences.

### III. **SUMMARY OF PROBABLE CAUSE**

5. Just after midnight on August 10, 2022, 47-year-old Z.R. was found dead on her couch from a fentanyl overdose. She had been using fentanyl for the past month with a man she met on the dating website Tinder ("Individual A"). The night of her death, Individual A supplied her with the fentanyl and used it with her. They both passed out shortly afterwards, and Z.R. never woke up. Individual A awoke to find Z.R. slumped over and nonresponsive. He tried to revive her twice with Narcan, but that did not work. He panicked, cleaned up the scene of all fentanyl paraphernalia, and left her alone. He could not find his phone, so he took her phone and called 911 claiming his friend's girlfriend was passed out in the house.

6. By tracking Z.R.'s phone, law enforcement found Individual A. When contacted by law enforcement, Individual A consented to a search of his car and his phone. In the car, law enforcement found fentanyl and paraphernalia used to ingest fentanyl. Individual A admitted to supplying Z.R. with the fentanyl that killed her; initially, he identified his supplier as someone he referred to as "J"; but later confirmed that his supplier was actually Edward WYSEL. A search of Individual A's phone revealed a text chain with WYSEL on August 8, 2022, the day before Z.R.'s death, where Individual A purchased 2 grams of fentanyl from WYSEL. Posing as Individual A and using Individual A's phone, law enforcement set up a sham drug buy

with WYSEL on August 11, 2022, and arrested WYSEL when he showed up with the requested fentanyl.  WYSEL also had $15,000 in suspected drug proceeds in his pocket. A subsequent search of WYSEL's home revealed approximately 311 more grams of fentanyl. WYSEL admitted in his post arrest interview that the 311 grams of fentanyl was his, he admitted to dealing fentanyl for over a year, and he admitted to selling fentanyl to Individual A Law enforcement also obtained surveillance video showing what appears to be the drug transaction between WYSEL and Individual A the day before Z.R.'s death.

7.      On September 14, 2022, a Coroner Detective, in consultation with a pathologist, attributed Z.R.'s cause of death to "polysubstance intoxication."  In June 2024, Dr. Shaun Carstairs, a board-certified Emergency Physician with an additional board certification in Medical Toxicology, opined that "to a reasonable degree of medical probability . . . the decedent's death in this case was due to fentanyl toxicity" and "but for the presence of fentanyl in the decedent's bloodstream, death would not have occurred."

IV. **STATEMENT OF PROBABLE CAUSE**

8.      Based on my review of law enforcement reports, body-worn camera footage, surveillance footage, cellphone downloads, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

A.    **Deputies Respond to 911-call**

9.      According to a Santa Barbara County Sheriff's Office ("SBCSO") incident report, on August 10, 2022, at approximately

4

12:21 a.m., SBCSO Deputy Miguel Rodriguez received a call for service for an unconscious subject at a residence on Gato Avenue in Goleta, California.  Deputies met Paramedic Brad Moore and Emergency Medical Technician (EMT) Carolina Watts at the scene, where they encountered Z.R., the decedent, slumped over on a couch in the living room, unresponsive and pulseless.  Attempts as resuscitation were unsuccessful and Z.R. was pronounced dead at 12:51 a.m.

    10.  The report SBCSO indicates that at the scene, Deputy Rodriguez found several medications prescribed to the decedent. Deputy Rodriguez also found the following medications that were not prescribed to the decedent: Hydrocodone-acetaminophen 5/325mg, Quetiapine Fumarate 100mg, Ibuprofen 600mg, and Doxycyline hyclate 50mg.  All the medications were seized and subsequently turned over to SBCSO Narcotics Bureau.  The decedent's cellphone was not located at the scene.

    11.  According to dispatch notes, the reporting party, later identified as Individual A, initially called 911 at 12:21 a.m. and reported that a friend had found decedent unconscious 20 minutes prior. Individual A advised that he was in Oxnard, California driving to the location.  A call back to the reporting number by dispatch went unanswered and to the voicemail belonging to the decedent.

    12.  SBCSO reports indicate that at approximately 2:05 a.m., Deputy Rodriguez was advised by dispatch that Individual A again called using the decedent's phone. At this time dispatch was able to provide law enforcement a precise location for the

5

decedent's phone, leading to Deputies Rodriguez and Shane Moore conducting a vehicle stop of Individual A in the area.

### B. Deputies Contact Individual A

13. SBCSO indecent reports indicate that upon Deputy Rodriguez contacting Individual A, Individual A stated that he was on the phone with dispatch. Individual A initially stated the phone was his, later stating that it was a friend's phone and he only used it to dial 911.

14. Individual A consented to a search of his vehicle, which resulted in the seizure of suspected methamphetamine, suspected fentanyl, multiple pieces of burnt foil and pieces of straw.

15. Individual A admitted that the fentanyl found in the car was his. He also admitted to being on scene when Z.R. passed out. He initially stated that only he used fentanyl, but that Z.R. did not because she was "loaded up" already when he arrived. But then Individual A admitted Z.R. had "one or two hits" of his fentanyl before they both passed out. He explained that when he awoke an hour or so later, Z.R. was unresponsive. He tried to revive her with Narcan and when that did not work, he panicked and cleaned up his drugs and paraphernalia and left.

16. Individual A was detained for the narcotics found in his possession and transported to the sheriff station to be further interviewed by narcotics detectives.

### C. SBCSO Narcotics Detectives Interview Individual A

17. On August 10, 2022, at approximately 3:30 a.m., SBCSO detectives James Furber and Michael Savey conducted a recorded

interview of Individual A at the sheriff station. I have reviewed the interview recording. Detective Savey advised Individual A of his Miranda rights. Individual A stated he understood his rights and agreed to speak with detectives.

18. Individual A stated that he met the decedent one month prior through the dating site, Tinder. During their first meeting, Individual A told the decedent about his struggle with addiction to fentanyl and the decedent asked if they could use together. Individual A stated that he had some fentanyl with him and they smoked it together. Since then he and the decedent smoked fentanyl together on an almost weekly basis. Individual A stated that the decedent never had any fentanyl and that he would always supply the fentanyl they smoked. He advised that he would purchase his fentanyl from "J" in Oxnard, California.

19. Regarding the incident leading up to decedent's death, Individual A informed detectives that he had purchased approximately two grams of fentanyl from "J" for approximately $100 on August 8, 2022, and that was the fentanyl that he and the decedent smoked together on August 9, 2022.

20. Individual A told detectives that he arrived at decedent's residence on August 9 at approximately 8:30 p.m. About twenty minutes into the visit, they began to smoke the fentanyl that Individual A had purchased from "J". After using, Individual A stated that they both fell asleep. Individual A was uncertain how long he slept for, but at approximately 10:30 p.m., Individual A awoke to find the decedent unconscious. Individual A attempted to wake the decedent, even administering

Narcan, without success. Individual A stated that he was scared and unsure of what to do, so he cleaned up. Individual A stated that he was not able to find his phone and took the decedent's phone instead. Upon leaving the residence, he called 911 from decedent's phone and then parked a short distance away to watch the residence.

21. During this interview, Individual A consented to the search of his phone by detectives. Individual A also admitted to knowledge of the dangers of fentanyl, stating that he had lost several friends to fentanyl overdoses.

**D.   Consent Search of Individual A's Phone**

22. On August 10, 2022, at approximately 11:00 a.m., the Honorable Anderle, Santa Barbara County Superior Court Judge, authorized a search warrant for the residence on Gato Avenue, Goleta, California. Subsequent to the search, Deputy Furber located Individual A's phone, a black Android cell phone, within the cushions of the couch in the living room.

23. I have reviewed the download from Individual A's phone. In that download, I saw drug related texts with a contact saved in the phone as "Eddie" using telephone number ***-***-8367. A record check on phone number returned that the phone is subscribed to "Edward Wysel." Individual A's communications with "Eddie" included a transaction negotiated on August 8, 2022. No other drug related communications were identified.

**E.     Second Interview of Individual A & Identification of WYSEL**

24.     On August 11, 2022, at approximately 4:19 p.m., detectives Furber and Savey contacted Individual A at the Santa Barbara County Jail to ask him follow up questions about his drug supplier. The interview was recorded and I have listened to the recording.

25.     In this interview, Individual A admitted that his dealer was named "Eddie," not J.  Individual A showed detectives a Facebook profile for Eddie, which was an account for an individual with the full name, "Eddie Wysel."  Individual A informed detectives that Eddie is the only individual from whom he purchased narcotics in the last few months.  Individual A stated that he purchased approximately two grams of fentanyl from Eddie in the parking lot of a smoke shop in Oxnard, and that was the same fentanyl that he and the decedent had smoked together resulting in decedent's death.

26.     Detectives were able to identify the parking lot Individual A described, which was outside a smoke shop at 250 Ventura Road in Oxnard, California.

**F.     Arrest of WYSEL**

27.     Using department resources and Edward Wysel's DMV records, SBCSO detectives determined that WYSEL's home address was a specific residence on L Street in Oxnard, California ("WYSEL's Residence") and that he drives a gray GMC Envoy bearing California license plate ending in 725 (the "GMC Envoy").

28. According to SBCSO incident reports, Detective Savey parked near WYSEL's home on August 11, 2022, and surveilled the location. In the driveway Detective Savey saw the GMC Envoy.

29. At approximately 2:30 p.m. on August 11, 2022, while parked outside WYSEL's address, Detective Savey used Individual A's phone to initiate the following text communication with WYSEL on WYSEL's number ending in 8367:

    Savey:   You around bro I need 2
    WYSEL:   330 345 or so possibly sooner
    Savey:   Ok thanks bro 345 cig shop
    WYSEL:   Are u there I'm meeting someone right now be there
    Savey:   Awesome
    WYSEL:   Are u there can't wait for u I have things to do
    Savey:   Yes I'm here

30. Shortly after WYSEL's last message, Detective Savey saw the Envoy reverse out of the driveway with a sole occupant/operator.

31. At the time of these messages, additional detectives were parked at the smoke shop parking lot at 250 Ventura Road (the lot used by WYSEL and Individual A on August 8).

32. Just a few minutes after WYSEL's car left his driveway, the detectives on surveillance at the smoke shop parking lot saw WYSEL's car pull into the lot and park in a stall. Second after he parked, WYSEL texted Individual A's phone, "I'm here".

33. Detectives then conducted a probable cause arrest of WYSEL and took him into custody without incident. According to SBCSO incident reports, a search incident to arrest of WYSEL revealed approximately two grams of suspected fentanyl in a cigarette box and approximately $15,000 in suspected drug proceeds in his wallet, which was in his pants' pocket.

34. Detective Chris Morales interviewed WYSEL in the back of a police cruiser on scene at 4:49 p.m., shortly after his arrest. The interview is captured on Morales's "COBAN" recording system. According to Detective Morales, WYSEL waived his rights and then made the following admissions. WYSEL confirmed his home address was WYSEL's Residence, and he explained he lives in the garage. He admitted to having an additional 300 grams of powder fentanyl inside his home. Specifically, folded inside a black blanket sitting on top of a portable air conditioning unit that was in the window. WYSEL also admitted he had been dealing drugs for over a year and that the $15,000 he had on him was largely drug proceeds, but some of his legitimate income mixed in. He would not name his supplier, but admitted to buying in approximately 15-ounce increments.

G. **Search of WYSEL's Residence**

35. On August 11, 2022, at approximately 6:17 p.m., the Honorable Adams, Santa Barbara County Superior Court Judge, authorized a search warrant for WYSEL's Residence. According to SBCSO reports, while executing that search warrant, detectives seized approximately 311 grams of suspected fentanyl in the blanket on top of the air conditioner, just as WYSEL described.

11

The 311 grams were split into five bags (approximately 92.4 grams, 68 grams, 51.9 grams, 43.3 grams, and 66.1 grams). Detectives also found a digital scale, packaging materials, and a second cellphone (a black Android) from the garage.

36. Each of the above-mentioned bags of suspected fentanyl were transported to the U.S. Department of Justice Drug Enforcement Administration Southwest Laboratory in Vista, California, where the contents were weighed and analyzed. The bags were each determined to contain a powder substance that contained N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl) (calc. as Hydrochloride).

**H. Interview of WYSEL**

37. On August 11, 2022, after the execution of the residential search warrant described above, Detectives Furber and Savey further interviewed WYSEL at Sheriff's headquarters. This interview was video and audio recorded and I have reviewed the recording. WYSEL stated that he understood his rights that had been previously read to him and WYSEL agreed again to speak with detectives.

38. WYSEL repeated the same admissions from his earlier interview, but also added that he is not a fentanyl user himself. WYSEL explained that the fentanyl he has in his house is from a 10-ounce purchase he made a few months prior. WYSEL claimed he only deals to two or three people, but that it can be up to three or four sales per week. WYSEL initially denied any recent deals with Individual A, but after detectives confronted him with the texts between WYSEL and Individual A setting up the

August 8 deal, WYSEL said something to the effect of, "the phone has a better memory than me."

    **I.    Surveillance Footage of the August 8, 2022 Transaction**

    39.    According to SBCSO reports, on August 11, 2022, SBCSO Detective Sergeant Matt Banks responded to the Smoke Shop at 290 South Ventura Road in Oxnard, to obtain footage from the shop's exterior cameras which appeared to cover portions of the parking lot. I have reviewed the footage he obtained.

    40.    Video surveillance footage from August 8, 2022, appears to show WYSEL and Individual A meeting at the parking lot at approximately 4:02 p.m.. Specifically, at approximately 3:53:37 p.m. that day, a dark colored vehicle, which appears to be a Corvette (believed to be Individual A's vehicle), enters the parking lot and parks in a stall. At approximately 4:02:14 p.m., a dark colored GMC Envoy (believed to be WYSEL's vehicle) enters the lot and interacts with the driver of the Corvette, who at this point has stepped out of his vehicle. From this angle and distance, one cannot see what either individual is doing, but the GMC Envoy remains there for approximately 30 seconds. The GMC Envoy then exits the camera's view westbound at 4:03:00 p.m., and at 4:03:28 p.m., Individual A's car exits the lot as well.

    41.    While on scene, Detective Sgt. Banks compared the clock on the live footage of the surveillance system with his department-issued iPhone and confirmed the accuracy of the time stamp to the second.

**J.   Coroner's Report Attributes the Cause of Death to Polysubstance Intoxication**

42.   According to the Coroner and autopsy reports in this case, on September 14, 2022, SBCSO Coroner Detective Kyle Bibby, in consultation with Pathologist Manny Montez, M.D., issued the findings and attributed the decedent's cause of death to "polysubstance intoxication."  The toxicology results on a peripheral sample indicated the following:

    Fentanyl:       4.1 ng/mL
    Hydrocodone:    10 ng/mL
    Alprazolam:     12 ng/mL
    THC:            4.7 ng/mL
    BAC:            0.21

The autopsy report further concluded that the decedent had pulmonary congestion.

**K.   But For Cause of Death Attributed to Fentanyl**

43.   In June 2024, I contacted Dr. Shaun Carstairs, a board-certified Emergency Physician with an additional board certification in Medical Toxicology, for an opinion on the but for causation of Z.R.'s death.  On or about June 26, 2024, Dr. Carstairs opined that the levels of hydrocodone, alprazolam, THC and alcohol were non-contributory factors and that "to a reasonable degree of medical probability . . . the decedent's death in this case was due to fentanyl toxicity".  Dr. Carstairs further opined that "but for the presence of fentanyl in the decedent's bloodstream, death would not have occurred."

## V. CONCLUSION

44. For all the reasons described above, there is probable cause to believe that WYSEL committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (Distribution of Fentanyl Resulting in Death).

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 5th day of July,
2024.

_____
HONORABLE BRIANNA F. MIRCHEFF
UNITED STATES MAGISTRATE JUDGE